1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL CHESS,

11              Plaintiff,                   No. CIV S-07-1767 LKK DAD P

12        vs.

13   J. DOVEY, et al.,

14              Defendants.                  FINDINGS AND RECOMMENDATIONS

15   _____/

16              Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17   relief under 42 U.S.C. § 1983.  This matter is before the court on a motion for summary

18   judgment brought, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on behalf of

19   defendants Abdur-Rahman, David, Dial, Dudley, French, James, Miller and Roche.  (Defs.'

20   Mem. of P. & A. (Doc. No. 90-1.)  Plaintiff has filed an opposition, (Doc. No. 96) and

21   defendants have filed a reply.  (Doc. No. 99.)

22              For the reasons set forth below, the court recommends that defendants' motion for

23   summary judgment be granted in part and denied in part.

24   /////

25   /////

26   /////

1

**BACKGROUND**

Plaintiff is proceeding on his original complaint (Doc. No. 1) against defendants Abdur-Rahman, David, Dial, Dudley, French, James, Miller and Roche.[1] Therein, plaintiff alleges as follows. Plaintiff is suffering from several serious medical conditions including, but not limited to, liver disease in the form of hepatitis C, Type I diabetes, Scoliosis, degenerative disc disease, gallstones, the loss of vision in his left eye, a Varicocele in his left testicle, seizures and an enlarged spleen. As a result of his serious medical conditions plaintiff suffers painful cramps in his lower extremities, abdominal pain, uncontrolled muscle twitching, headaches, skin rashes, loss of balance, and constant pain. To treat his pain plaintiff requires pain medication that is effective and will not damage his liver. Moreover, as a result of his serious medical conditions plaintiff has an increased risk of infection, amputation, stroke, heart disease, and cancer. Plaintiff is also over fifty years old and has high triglyceride levels. He therefore requires a special diet prepared by a medically trained dietitian to treat his diabetes and to lower his triglyceride levels. (Compl. (Doc. No. 1) at 4-5.)[2]

From 1997 to 2000, plaintiff was incarcerated at Duel Vocational Institution. At that time plaintiff was not diabetic and was suffering only intermittent pain in his back and eye, even though he had suffered a neck injury. In 2000, he was transferred to California State Prison, Corcoran where he was diagnosed with liver disease, a Varicocele in his left testicle, back pain and neck pain. Plaintiff was prescribed pain medication to treat his resulting pain. In 2003, plaintiff was again transferred, this time to California State Prison, Solano ("CSP-Solano"). During his time at CSP-Solano plaintiff suffered two seizures, both of which resulted in injury to

---

[1] Plaintiff's complaint is a lengthy document that includes 14 pages of factual statements and arguments, 36 pages of inmate appeals and responses, which plaintiff incorporates as part of his complaint and from which respondent has identified separate claims, and 50 pages of exhibits. (Doc. No. 1)

[2] Page number citations such as this one are to the page number reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

his head, neck and upper body.  Plaintiff was diagnosed as suffering from degenerative disc disease, gallstones and seizures.  After trying several different medications it was determined that the only effective medication for the treatment of plaintiff's seizures was Kolonopin and the only effective medication for the treatment of his chronic pain was Methadone.  During his time at CSP-Solano, plaintiff's glucose levels were normal.

On November 21, 2006, plaintiff was transferred to High Desert State Prison ("HDSP") and placed in the Correctional Treatment Center.  He spoke with defendant Dr. Dial who informed plaintiff that due to his numerous medical problems he would be transferred to the California Medical Facility, Vacaville ("CMF-Vacaville").  Plaintiff was then housed in the HDSP psychiatric ward, where he was forced to sleep in a cold cell, in only his underwear, and without a blanket.  After a few days and several requests, plaintiff was given a paint stained wool blanket that caused him to break out in a rash.  Plaintiff showed his rash to a nurse and was told that "it happens to all of us."  (Id. at 7-8.)

At some point in time defendant Dr. Dial assigned defendant Miller, a nurse practitioner, to treat plaintiff.  Defendant Miller also informed plaintiff that due to his numerous medical problems he would be transferred to CMF-Vacaville.  A week later defendant Miller informed plaintiff that HDSP staff had informed Miller that plaintiff would not be transferred to CMF-Vacaville.  Thereafter, plaintiff was tapered off of Klonopin and Methadone.  Plaintiff requested to speak with a doctor trained to treat patients suffering from chronic pain but his request was denied.  As a result of being tapered off Methadone plaintiff suffered withdrawal symptoms.  Moreover, all of plaintiff's medical conditions worsened after he was taken off of Klonopin and Methadone.  (Id. at 8-10.)

For two weeks plaintiff's requests for pain medication, to see a doctor and to see defendant Miller were denied.  Finally defendant Miller saw plaintiff in his cell and ordered pain medication for him.  Defendant Miller did not, however, tell plaintiff what medication she had ordered.  Defendant Miller prescribed plaintiff over-the-counter pain medications such as

Tylenol, Ibuprofen, and Naprosyn that were not effective in treating his pain and which were harmful to his liver. Defendant Miller also prescribed plaintiff niacin. Plaintiff is allergic to niacin and broke out in a rash on his ankles, legs, stomach and neck that developed into blisters that broke, became infected and left permanent scars. Plaintiff's repeated requests to see a doctor for his pain and to receive Methadone were denied. (Id. at 10-11.)

On December 14, 2006, plaintiff was seen for complaints of eye pain. Plaintiff was diagnosed as being blind in his left eye and was prescribed eye drops. That evening and the following day he was told that defendant Miller had ordered that his eye drops be given to another inmate who she believed needed the medication more than plaintiff. Plaintiff asked to speak to defendant Miller but his requests were denied. (Id. at 11-12.)

Plaintiff also claims that all the defendants were aware of his elevated liver enzymes and liver disease. Plaintiff asked each defendant for treatment of his liver disease, including a liver biopsy and Interferon treatment, but those requests were denied. Plaintiff also asked each defendant for medication that was effective in treating his pain and not harmful to his liver, but those requests were denied. Finally, plaintiff claims that he made requests to each defendant for a medical diet to lower his triglycerides, blood sugar and improve his health, and that those requests were also denied. (Id. at 13-14, 17, 19-20, 28-29, 40.)

Plaintiff claims that the defendants have denied him adequate medical care in violation of the Eighth Amendment and seeks compensatory and punitive damages. (Id. at 102.)

PROCEDURAL HISTORY

On August 5, 2008, the court ordered the United States Marshal to serve plaintiff's complaint on defendants Abdur-Rahman, David, Dial, Dudley, French, James, Miller and Roche. (Doc. No. 16.) Defendants Abdur-Rahman, Miller, James, Roche and French filed a motion to dismiss on October 3, 2008, arguing that plaintiff failed to satisfy the "short and plain statement" requirement under Federal Rule of Civil Procedure 8(a) demonstrating that he is entitled to relief and that plaintiff's injunctive relief claims were subsumed under the Plata v.

4

1   Schwarzenegger class action lawsuit.  (Doc. No 24.)  Defendant David, and defendants Dial and

2   Dudley joined in the motion to dismiss on February 4, 2009, and June 5, 2009, respectively.

3   (Doc. Nos. 32, 42.)  On September 1, 2009, defendants motion to dismiss was granted with

4   respect to plaintiff's claims for injunctive relief but denied in all other respects.  (Doc. No. 54.)

5   Defendants Abdur-Rahman, David, Dial, Dudley, French, James, Miller and Roche filed an

6   answer on December 8, 2009.  (Doc. No. 62.)  On December 15, 2009, the undersigned issued a

7   discovery order.  (Doc. No. 63.)

8          On August 4, 2010, counsel for defendants filed a motion for summary judgment,

9   arguing that the defendants were entitled to entry of judgment in their favor because: (1) there is

10  no evidence that they were deliberately indifferent to plaintiff's serious medical needs; and (2)

11  they are entitled to qualified immunity.  (Doc. No. 90.)  Plaintiff filed an opposition to

12  defendants' motion for summary judgment on September 27, 2010.  (Doc. No. 96.)  Defendants

13  filed a reply on October 11, 2010.  (Doc. No. 99.)

14                    **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

15         Summary judgment is appropriate when it is demonstrated that there exists "no

16  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

17  matter of law."  Fed. R. Civ. P. 56(c).

18           Under summary judgment practice, the moving party
             always bears the initial responsibility of informing the district court
19           of the basis for its motion, and identifying those portions of "the
             pleadings, depositions, answers to interrogatories, and admissions
20           on file, together with the affidavits, if any," which it believes
             demonstrate the absence of a genuine issue of material fact.
21

22  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

23  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

24  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

25  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

26  after adequate time for discovery and upon motion, against a party who fails to make a showing

1  sufficient to establish the existence of an element essential to that party's case, and on which that

2  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

3  concerning an essential element of the nonmoving party's case necessarily renders all other facts

4  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

5  whatever is before the district court demonstrates that the standard for entry of summary

6  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

7            If the moving party meets its initial responsibility, the burden then shifts to the

8  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

9  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

10  establish the existence of this factual dispute, the opposing party may not rely upon the

11  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

12  form of affidavits, and/or admissible discovery material, in support of its contention that the

13  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

14  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

15  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

16  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

17  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

18  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

19  1436 (9th Cir. 1987).

20            In the endeavor to establish the existence of a factual dispute, the opposing party

21  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

22  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

23  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

24  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

25  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

26  committee's note on 1963 amendments).

1          In resolving the summary judgment motion, the court examines the pleadings,

2    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

4    477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

5    court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

6    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

7    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

8    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

9    1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

10   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

11   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

12   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

13             **OTHER APPLICABLE LEGAL STANDARDS**

14   I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

15         The Civil Rights Act under which this action was filed provides as follows:

16         Every person who, under color of [state law] . . . subjects, or causes
            to be subjected, any citizen of the United States . . . to the

17         deprivation of any rights, privileges, or immunities secured by the
            Constitution . . . shall be liable to the party injured in an action at

18         law, suit in equity, or other proper proceeding for redress.

19   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

20   actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

21   Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

22   (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

23   meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

24   omits to perform an act which he is legally required to do that causes the deprivation of which

25   complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

26   /////

1    Moreover, supervisory personnel are generally not liable under § 1983 for the

2  actions of their employees under a theory of respondeat superior and, therefore, when a named

3  defendant holds a supervisorial position, the causal link between him and the claimed

4  constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

5  (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

6  allegations concerning the involvement of official personnel in civil rights violations are not

7  sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

8  II.  The Eighth Amendment and Inadequate Medical Care

9    The unnecessary and wanton infliction of pain constitutes cruel and unusual

10 punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

11 Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

12 In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove

13 that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

14 acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v.

15 Seiter, 501 U.S. 294, 298-99 (1991).

16    Where a prisoner's Eighth Amendment claims arise in the context of medical

17 care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

18 deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth

19 Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

20 and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050,

21 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133

22 (9th Cir. 1997) (en banc).

23    A medical need is serious "if the failure to treat the prisoner's condition could

24 result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

25 McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical

26 need include "the presence of a medical condition that significantly affects an individual's daily

activities." Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner

satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v.

Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then

show that prison officials responded to the serious medical need with deliberate indifference.

Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials

deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94

(9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

to medical care, however, "the indifference to his medical needs must be substantial.  Mere

'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

105-06.  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

negligence in diagnosing or treating a medical condition, without more, does not violate a

prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate

indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835

(quoting Whitley, 475 U.S. at 319).

Delays in providing medical care may manifest deliberate indifference.  Estelle,

429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

prisoner need not show his harm was substantial; however, such would provide additional

support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

9

1    v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

2         Finally, mere differences of opinion between a prisoner and prison medical staff

3    or between medical professionals as to the proper course of treatment for a medical condition do

4    not give rise to a § 1983 claim.  Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330,

5    332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662

6    F.2d 1337, 1344 (9th Cir. 1981).

7    III.  Qualified Immunity

8         "Government officials enjoy qualified immunity from civil damages unless their

9    conduct violates 'clearly established statutory or constitutional rights of which a reasonable

10   person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting

11   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is presented with a qualified

12   immunity defense, the central questions for the court are (1) whether the facts alleged, taken in

13   the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a

14   statutory or constitutional right and (2) whether the right at issue was "clearly established."

15   Saucier v. Katz, 533 U.S. 194, 201 (2001).

16        Although the court was once required to answer these questions in order, the

17   United States Supreme Court has recently held that "while the sequence set forth there is often

18   appropriate, it should no longer be regarded as mandatory."  Pearson v. Callahan, 555 U.S. 223,

19   ___, 129 S. Ct. 808, 818 (2009).  In this regard, if a court decides that plaintiff's allegations do

20   not make out a statutory or constitutional violation, "there is no necessity for further inquiries

21   concerning qualified immunity."  Saucier, 533 U.S. at 201.  Likewise, if a court determines that

22   the right at issue was not clearly established at the time of the defendant's alleged misconduct,

23   the court may end further inquiries concerning qualified immunity at that point without

24   determining whether the allegations in fact make out a statutory or constitutional violation.

25   Pearson, 129 S. Ct. at 818-21.

26   /////

1    In deciding whether the plaintiff's rights were clearly established, "[t]he proper

2  inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was

3  unlawful in the situation he confronted' . . . or whether the state of the law [at the relevant time]

4  gave 'fair warning' to the officials that their conduct was unconstitutional." Clement v. Gomez,

5  298 F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202). The inquiry must be

6  undertaken in light of the specific context of the particular case. Saucier, 533 U.S. at 201.

7  Because qualified immunity is an affirmative defense, the burden of proof initially lies with the

8  official asserting the defense. Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532, 1536

9  (9th Cir. 1992); Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

10                **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

11  I. Defendants' Statement of Undisputed Facts and Evidence

12    Defendants statement of undisputed facts is supported by citations to copies of

13  plaintiff's medical records, health care services request forms and deposition testimony.

14    The evidence submitted by the defendants establishes the following facts. On

15  November 21, 2006, plaintiff was transferred from CSP-Solano to HDSP. On November 22,

16  2006, defendant Dr. Dial examined plaintiff, noted his medical history, and evaluated his

17  medications. Prior to his arrival at HDSP plaintiff had been prescribed Methadone, Klonopin,

18  thiamine, niacin and aspirin.[3] Defendant Dial admitted plaintiff to the Correctional Treatment

19  Center ("CTC") on November 22, 2006, for in-patient care and monitoring while plaintiff's

20  medications were adjusted to comply with the policies of HDSP, specifically the policy that

21  Methadone was not provided to patients in general population, where plaintiff was to be housed.

22  /////

23  /////

24  _____

25    [3] Counsel for defendants has not provided a declaration from any defendant or from any other medical professional. Such a declaration might have provided explanatory information about the medications listed in defendants statement of undisputed facts and their relevance to plaintiff's medical care. Defendants instead have chosen to leave that evidence unexplained.

26

1   Defendant Dial prescribed plaintiff Naprosyn/Narpoxen and aspirin to treat his pain.[4]  Also on

2   November 22, 2006, defendant nurse practitioner Miller examined plaintiff, took his medical

3   history and proceeded to implement defendant Dr. Dial's orders.  On November 28, 2006,

4   defendant Miller reviewed plaintiff's medical chart dating back to 2004 and obtained special

5   approval to obtain Clonazepam/Klonopin for plaintiff pursuant to defendant Dr. Dial's order.

6   (Defs.' SUDF (Doc. No. 91) 1-8.)[5]

7              On December 3, 2006, defendant Dr. James ordered that plaintiff be tapered off of

8   Klonopin.  Defendant Dr. James did not alter plaintiff's prescription for Naprosyn/Naproxen that

9   was previously prescribed by defendant Dr. Dial.  On December 4, 2006, plaintiff complained of

10  a skin condition and defendant nurse practitioner Miller prescribed him Hydrocortisone cream.

11  On December 6, 2006, defendant Miller discontinued plaintiff's prescriptions for thiamine,

12  niacin, Hydroxyzine and Hydrocortisone cream at plaintiff's request.  Defendant Miller also

13  referred plaintiff to an ophthalmologist to address his eye issues, requested a CT scan to address

14  his liver and gall bladder conditions, and referred plaintiff for a psychiatric evaluation to address

15  possible paranoia and manipulative behavior.[6]  (Defs.' SUDF (Doc. No. 91) 9-14.)

16             On December 8, 2006, defendant Miller again saw plaintiff and noted that

17  plaintiff was angry and was demanding to see a medical doctor instead of a nurse practitioner.

18  Defendant Miller also noted that plaintiff's history of seizures was undocumented, was based

19  entirely on plaintiff's subjective reports, and that the results of an October 2005 CT scan of

20  plaintiff's head were normal.  Defendant Miller continued to taper plaintiff off of Klonopin and

21

22      [4]  Because plaintiff was sometimes given more than one form of a specific medication,
23  i.e., brand name and generic, defendants refer to related medication by both the brand name and
    generic name, separated by a slash.  (Defs.' Mem. of P. & A (Doc. No. 90-1) at 7.)

24      [5]  Citations to defendants' Statement of Undisputed Facts are to the specific numbered
25  undisputed fact asserted.

26      [6]  However, the evidence presented by defendants does not establish that the CT scan of
    plaintiff ordered December 6, 2006, was ever performed.

continued plaintiff's previous prescription for Naprosyn/Naproxen.[7]  Defendant Miller again saw plaintiff on December 11, 2006, noted that he was still angry about not seeing a medical doctor and was also angry that he had stopped receiving Methadone.  Plaintiff claimed that Methadone was "best for his liver."  Defendant Miller advised plaintiff that treatment of his liver and eye were being addressed by the pending requests for blood tests, a CT scan and an ophthalmology consultation.  (Defs.' SUDF (Doc. No. 91) 15-19.)

On December 14, 2006, plaintiff had an ophthalmology consultation and it was determined that no prescription was necessary to address his eye issues.  The following day plaintiff complained of a headache and requested a multivitamin without iron for his hepatitis C.  Defendant Miller submitted a request for a special multivitamin without iron and increased plaintiff's previously prescribed aspirin from 80mg to 325mg to treat his headache.  Defendant Miller also referred plaintiff to optometry in response to his complaint that his reading glasses were no longer effective.  On December 18, 2006, defendant Miller extended plaintiff's prescription for 325mg aspirin for two more weeks in response to plaintiff's complaint of pain.  On December 20, 2006, defendant Miller implemented orders for Atorvastin, Naprosyn, a multivitamin without iron, folic acid, and aspirin.[8]  (Defs.' SUDF (Doc. No. 91) 20-25.)

On December 26, 2006, plaintiff was discharged from the CTC with a continuing treatment plan calling for: 1) a follow up appointment in the medical clinic in two weeks; 2) prescriptions for folic acid, 80mg aspirin, and 325mg Tylenol; 3) blood tests examining his liver functions and blood cell counts; and, 4) a request for an ultrasound of the liver.  On January 12, 2007, plaintiff underwent an abdominal ultrasound which found that he had tiny gallstones in his

---

[7]  Defendants frequently use the term "continued."  However, it is unclear from the evidence submitted by defendants in support of their motion whether there use of the word "continued" is meant to indicate that the duration of plaintiff's prescription was extended or simply that the previously prescribed medication was not discontinued or altered.

[8]  Defendants do not indicate who prescribed these medication nor why they were prescribed for plaintiff.

gallbladder.  Plaintiff however refused to have his gallbladder removed.  On January 22, 2007, a Chronic Care Program baseline history was documented to address plaintiff's systemic medical issues.  In February of 2007, plaintiff underwent additional lab tests.[9]  (Defs.' SUDF (Doc. No. 91) 26-30.)

On March 1, 2007, plaintiff met with defendant Dudley, a certified physician's assistant, to address formal complaints plaintiff had submitted via the inmate grievance procedure.  Plaintiff had complained that he wanted to see an eye specialist, that he needed daily showers due to his liver disease, the he needed a low cholesterol diet due to his high triglyceride levels, the he had numbness in his feet and that he did not want to be treated anymore by Dr. Horenstein.  Defendant Dudley advised plaintiff that neither of the eye specialists that examined plaintiff recommended any need for visual impairment status with corrective lens, that daily showers were not necessary for the treatment of his liver disease, that a low cholesterol diet was not available to general population inmates but that plaintiff could eat a propr diet by making wise choices from the food he was provided, that plaintiff would return to the clinic to address the numbness in his feet and that plaintiff would be treated by a doctor other than Dr. Horenstein.  On March 29, 2007, plaintiff had a chest x-ray which could not exclude the presence of small nodules in his left lung.  (Defs.' SUDF (Doc. No. 91) 31-34.)

On April 2, 2007, defendant David, another certified physician's assistant, ordered additional laboratory testing of plaintiff's liver functions and ordered repeat testing in another six weeks to monitor plaintiff's liver disease.  On April 6, 2007, defendant David reviewed the results of plaintiff's laboratory tests ordered April 2, and observed that plaintiff's blood sugar level was sharply elevated in comparison to a December 2006 blood test.  Defendant David discovered that despite being instructed to fast for his April 2007 blood test, plaintiff had eaten a meal approximately one hour before his blood was drawn.  Defendant David ordered a repeat test

---

[9]  Defendants do not specify what lab tests plaintiff underwent in this regard.

that same day, as well as a search of plaintiff's cell for evidence of unreported food plaintiff may have possessed.  Defendant David also administered plaintiff insulin to treat his high blood sugar level.  (Defs.' SUDF (Doc. No. 91) 35-39.)

On April 11, 2007, defendant Dr. Abdur-Rahman ordered insulin for plaintiff and a re-check of his blood sugar twelve hours after the administration of insulin.  On April 13, 2007, defendant David diagnosed plaintiff as suffering from diabetes, enrolled him in the Chronic Care Program, ordered insulin treatment, regular blood tests to monitor his blood sugar, and prescribed plaintiff the pain medicine Neurontin/Gabapentin for ninety days.  On April 14, 2007, defendant Dr. Abdur-Rahman again ordered insulin and blood tests to further regulate plaintiff's newly diagnosed diabetes.  On April 20, 2007, defendant David again prescribed plaintiff Neurontin/Gabapentin for ninety days.  (Defs.' SUDF (Doc. No. 91) 40-43.)

On May 7, 2007, plaintiff underwent a follow-up Chronic Care Program consultation, at which all of his symptoms were noted, and the plan to continue his then-current medications, monitor his conditions with blood tests, and continue with a pending gastroenterology ("GI") consultation, was confirmed.  On May 10, 2007, defendant David reviewed plaintiff's latest blood tests.  That same day, defendant nurse practitioner French confirmed that plaintiff's vision problems did not qualify him for a vision impairment disability. (Defs.' SUDF (Doc. No. 91) 44-46.)

On June 3, 2007, plaintiff was inadvertently given an incorrect dose of insulin by a non-defendant nurse practitioner.  Defendant Dr. James was the physician on call at the time. When telephoned and informed of the error defendant Dr. James ordered that plaintiff be provided with Ensure and a meal, and that his blood sugar levels be closely monitored.[10]  On June 24, 2007, plaintiff fainted while in his cell and was taken to the CTC.  Defendant Dr. James

---

[10]  The exhibit cited by respondent in support of this undisputed fact states that defendant Dr. James ordered that plaintiff's blood sugar be checked every hour for three hours and that he be called in one hour with plaintiff's blood sugar level.  (Defs.' Ex. LL (Doc. No. 91-3) at 50.)

was notified of plaintiff's fainting via telephone and ordered that plaintiff be given an

intravenous treatment of Narcon and that plaintiff be catheterized to obtain a urine sample for a

toxicology screen.  Plaintiff was sent to Banner Lassen Medical Center ("BLMC") for further

treatment and a complete evaluation.  The medical professionals at BLMC were unable to

determine what caused plaintiff to faint. (Defs.' SUDF (Doc. No. 91) 47-49.)

On July 4, 2007, plaintiff was examined by defendant Dr. Abdur-Rahman in

response to complaints of upper right quadrant pain.  Defendant Dr. Addur-Rahman noted that

plaintiff was already receiving Neurontin/Gabapentin for his pain and that plaintiff had a pending

referral for a GI consultation.  Dr. Addur-Rahman physically examined plaintiff, found him to be

suffering from nonspecific abdominal pain, and referred him for a follow-up at the primary care

clinic later that week.  On July 6, 2007, defendant French met with plaintiff to discuss his

complaint about not receiving Methadone.  Defendant French asked plaintiff what his chronic

pain issues were and plaintiff indicated that they were his liver, his gallstones and his Variocele.

Defendant French told plaintiff that he would not be treated with Methadone.  Plaintiff became

argumentative and agitated and defendant French asked prison staff to remove plaintiff from the

clinic.  Defendant French also ordered repeat laboratory tests to measure plaintiff's liver

functions and ammonia levels, and submitted a request for a GI consultation.  (Defs.' SUDF

(Doc. No. 91) 50-56.)

On August 8, 2007, defendant Dr. David increased plaintiff's

Neurontin/Gabapentin to 800mg for ninety days in response to plaintiff's complaint of right

upper quadrant pain.  On August 17, 2007, plaintiff underwent the GI consultation for which he

had been referred previously.  The plan generated as a result of that consultation was that

plaintiff would undergo: 1) a quad phase CT scan of his abdomen and pelvis; 2) blood tests for

his liver disease; 3) an endoscopy; 4) a colonoscopy; 5) receive insulin instructions in preparation

for the endoscopy and colonoscopy; and 6) be recommended for a liver biopsy.  The following

day defendant Dudley submitted two urgent requests for plaintiff to have an endoscopy,

1  colonoscopy and abdominal CT scan.  On August 24, 2007, defendant David submitted a second

2  optometry referral for plaintiff.  On August 28, 2007, defendant Abdur-Rahman examined

3  plaintiff in the High Risk Clinic, reviewed plaintiff's most recent blood tests and treatment and

4  gave plaintiff a physical examination.  Defendant Abdur-Rahman ordered that plaintiff return to

5  the High Risk Clinic in thirty days.[11]  (Defs.' SUDF (Doc. No. 91) 57-62.)

6  II.  Defendants' Arguments

7         Defense counsel argues that all defendants are entitled to summary judgment in

8  their favor with respect to plaintiff's Eighth Amendment inadequate medical care claim because

9  there is no evidence that they were deliberately indifferent to plaintiff's serious medical needs.

10  Defense counsel also argues that the defendants are entitled to qualified immunity.  (Defs.' Mem.

11  of P. & A (Doc. No. 90-1) at 15-38.)

12         First, counsel individually addresses each defendant's response to plaintiff's

13  serious medical needs and contends that the evidence before the court establishes that each

14  defendant treated plaintiff's serious medical needs without delay, interference or purposeful

15  ignorance.  (Defs.' Mem. of P. & A (Doc. No. 90-1) at 15-36.)

16         Second, defense counsel argues that each of the defendants are entitled to

17  qualified immunity because the evidence does not establish that the defendants violated

18  plaintiff's constitutional rights.  In addition, counsel contends that a reasonable person in the

19  defendants' respective positions could have reasonably believed that their conduct in connection

20  with plaintiff's medical care was lawful.  (Defs.' Mem. of P. & A (Doc. No. 90-1) at 36-38.)

21  /////

22  /////

23

24       [11] The following day, August 29, 2007, plaintiff filed the complaint now pending before
     the court.  While defendants' statement of undisputed facts goes on to provide additional
25  undisputed facts relating to events occurring after the date on which plaintiff filed his complaint
     those asserted facts occurring after the date plaintiff filed his complaint will not be discussed in
26  these findings and recommendations.

1    III.  Plaintiff's Opposition

2              Found in plaintiff's opposition is a reproduction of the facts enumerated in the

3    defendants' separate statement of undisputed facts, expressly admitting or denying each fact, as

4    well as another hundred pages of exhibits, most of which were either submitted by plaintiff with

5    his complaint or were submitted by defendants to establish the undisputed facts supporting their

6    motion for summary judgment.[12]  In his opposition plaintiff disputes defendants' contentions and

7    reiterates his arguments as to why each of the defendants violated his Eight Amendment rights by

8    being deliberately indifferent to his serious medical needs.[13]

9    IV.  Defendants' Reply

10             In reply, counsel for defendants argues that plaintiff's medical records prove that

11   the defendants provided plaintiff with sound medical care.  Moreover, the defendants argue that

12   plaintiff has failed to establish that the defendants are not entitled to qualified immunity.  (Defs.

13   Reply (Doc. No. 99) at 1-11.)

14   /////

15

16        [12]  As was the case with his complaint, plaintiff's opposition to defendants' motion for
     summary judgment is a lengthy, and somewhat confusing, document.  (Pl.'s Opp'n to Defs' Mot.
17   for Summ. J. (Doc. No. 96, 96-1.))  The opposition alone is over a hundred pages, the last half of
     which is a series of documents identified as statements of disputed facts for each individual
18   defendant.  Plaintiff lists each defendant's name, and "concurs" or "objects" to approximately
     twenty enumerated "facts," providing a lengthy basis for his objection to specific "facts."  It is,
19   however, entirely unclear as to what "facts" plaintiff is referring to in this regard.

20        [13]  Plaintiff asserts for the first time in his opposition to defendants' motions for summary
     judgement that he is a protected individual under the Americans with Disabilities Act ("ADA")
21   and that the defendants have violated his rights under the ADA.  (Pl.'s Opp'n to Defs.' Mot. for
     Summ. J. (Doc. No. 96) at 2-3.)  This allegation is not found in plaintiff's complaint.  Plaintiff is
22   advised that an opposition to a motion for summary judgment is not a proper vehicle for adding
     new claims to his complaint.  See Wasco Products, Inc. v. Southwall Technologies, Inc., 435
23   F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect to
     each material element of the underlying legal theory . . . .  Simply put, summary judgment is not
24   a procedural second chance to flesh out inadequate pleadings."); Brass v. County of Los Angeles,
     328 F.3d 1192, 1197-98 (9th Cir. 2003) (upholding the district court's finding plaintiff had
25   waived § 1983 arguments raised for first time in summary judgment motion where nothing in
     amended complaint suggested those arguments, and plaintiff offered no excuse or justification
26   for failure to raise them earlier).

**ANALYSIS**

I.  Plaintiff's Serious Medical Needs

Based on the evidence presented by the parties in connection with the pending motions for summary judgment, the undersigned finds that a reasonable juror could conclude that plaintiff suffered from multiple serious medical needs requiring medical treatment.  See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose.").  Indeed, defendants expressly "acknowledge that, during all relevant times, plaintiff had serious medical needs."  (Defs.' Mem. of P. & A (Doc. No. 90-1) at 16.)  Accordingly, resolution of the pending motion hinges on whether, based upon the evidence before the court, a rationale jury could conclude that the defendants responded to plaintiff's serious medical needs with deliberate indifference.  Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

II.  Defendants' Response to Plaintiff's Serious Medical Needs

It is noted at the outset that some of plaintiff's claims are alleged against all defendants, while other claims implicate only a specific defendant.  Therefore, the court will examine plaintiff's claims, in turn below, as follows:  (1) those claims implicating all defendants and which the court recommends that defendants motion for summary judgment be granted; (2) those claims implicating a specific defendant and which the court recommends that defendants motion for summary judgment be granted; and, (3) those claims with respect to which the court recommends that defendants' motion for summary judgment be denied.

/////

A.  <u>Claims As to Which Summary Judgement Should Be Granted</u>

    1)  <u>Claims Implicating All Defendants</u>

        a.  <u>Treatment to Alleviate Further Damage to Plaintiff's Liver</u>

      Plaintiff claims that the defendants failed to provide him adequate medical care to alleviate further damage to his liver.  Plaintiff specifically alleges that he asked each defendant to order a biopsy of his liver "to confirm the diagnosis" of "hepatocellular carcinoma" and that he requested Interferon treatment for his hepatitis C, and that the defendants denied his requests. (Compl. (Doc. No. 1) at 13, 17.)

      The evidence before the court establishes that the defendants did provide plaintiff medical care for his liver disease, which ultimately resulted in a recommendation that plaintiff be considered for a liver biopsy.  Specifically, on December 6, 2006, defendant Miller ordered a CT scan of plaintiff's abdomen to examine his liver.  On December 26, 2006, blood tests and an ultrasound were also ordered to examine plaintiff's liver.  On April 2, 2007, defendant David ordered further blood tests of plaintiff's liver.  On July 6, 2007, defendant French ordered blood tests of plaintiff's liver and submitted a request for a GI consultation.  On August 17, 2007, plaintiff's GI consultation was held.  In response to that consultation it was determined that plaintiff would undergo a CT scan of his abdomen, additional blood tests, an endoscopy, a colonoscopy and that plaintiff would be considered for a liver biopsy.  The following day defendant Dudley submitted urgent requests for plaintiff's endoscopy, colonoscopy and CT scan. (Defs.' SUDF (Doc. No. 91) 14, 27, 35, 56, 58-60; Defs.' Ex. K (Doc. No. 91-2) at 24; Defs.' Ex. U-V, QQ (Doc. No. 91-3) at 6-8, 72; Defs.' Ex. RR, TT-UU (Doc. No. 91-4) at 2, 7-13.)

      While plaintiff obviously disagrees with the defendants decision to monitor his liver disease through blood tests, CT scans and ultrasound examination before considering a liver biopsy, as noted above, a mere difference of opinion between a prisoner and prison medical staff as to the proper course of medical treatment for a condition does not give rise to a cognizable § 1983 claim.  Moreover, even assuming arguendo that the defendants were negligent in failing to

1   order a biopsy of plaintiff's liver, or in failing to treat him with Interferon, plaintiff has not

2   presented this court with any evidence that the defendants' course of treatment was deliberately

3   indifferent to his serious medical needs.  Of course, "mere 'indifference,' 'negligence,' or

4   'medical malpractice' will not support this cause of action."  Broughton, 622 F.2d at 460 (9th

5   Cir. 1980) (citing Estelle, 429 U.S. at 105-06).  See also Toguchi, 391 F.3d at 1057 ("Mere

6   negligence in diagnosing or treating a medical condition, without more, does not violate a

7   prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Thus, "a

8   complaint that a physician has been negligent in diagnosing or treating a medical condition does

9   not state a valid claim of medical mistreatment under the Eighth Amendment."  Estelle, 429 U.S.

10  at 106.  Even gross negligence is insufficient to establish deliberate indifference to serious

11  medical needs.  See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  Here, simply

12  put, the evidence establishes that plaintiff received medical care with respect to the monitoring of

13  his liver condition and he has failed to present any evidence that the treatment he was provided

14  was constitutionally deficient or that he suffered any injury as a result thereof.

15                             b.  Medical Diet

16          Plaintiff claims that he asked each defendant to order him a special medical diet to

17  "maintain [his] health and quality of life" and that each of the defendants refused his request.

18  Plaintiff alleges that the meals provided him at HDSP are "90% starchy foods, with no natural

19  source of vitamin C" and lack sufficient quantities of fresh fruits and vegetables to provide the

20  necessary amounts of "bioflavonoids" and roughage to maintain his health.  (Compl. (Doc. No.

21  1) at 13, 41-42.)

22          The evidence submitted by defendants establishes that on March 1, 2007, plaintiff

23  requested a low cholesterol diet.  Defendant Dudley, a certified physician's assistant, informed

24  plaintiff that low cholesterol diets were not available to inmates in general population and that

25  plaintiff could eat a proper diet by making wise choices from the food he was provided.  (Defs.'

26  SUDF (Doc. No. 91) 32-33; Defs.' Ex. Y (Doc. No. 91-3) at 17.)  On June 20, 2007, defendant

Roche issued a decision denying plaintiff's inmate appeal in this regard.  (Compl. (Doc. No. 1) at 31-34.)  In that decision defendant Roche noted that HDSP serves a "heart healthy" diet to all inmates.  (Id. at 34.)

Plaintiff has presented no evidence that the food offered at HDSP is unhealthy, that the denial of his requested special diet was medically unacceptable, or that he was denied a special diet in conscious disregard of an excessive risk to his health.  Moreover, while plaintiff disagrees with defendants decision not to provide him with a special diet, as stated above a mere difference of opinion between a prisoner and prison medical staff as to the proper course of medical treatment for a condition does not give rise to a cognizable § 1983 claim.  See Litmon v. Santa Clara County, 2009 WL 890884, at *9 (N.D. Cal. Mar. 31, 2009) (summary judgment granted for defendants on plaintiff's claim that the discontinuation of his low-fat diet by jail officials constituted deliberate indifference to his serious medical needs in light of evidence that defendants continued to treat plaintiff's high-cholesterol condition and plaintiff presented no evidence that he suffered any ill-effects after the special diet was discontinued); Chappell v. Cadina, No. C 94-2214 FMS, 1995 WL 165757, at *3-4 (N.D. Cal. Apr. 5, 1995) (summary judgment in favor of defendant prison doctors granted where plaintiff claimed that he required a special low salt diet and defendants submitted declarations opining that plaintiff could eat the regular diet provided to prisoners as long as he did not add salt to the food).

### c.   Treatment For Gallstones

Plaintiff alleges that he made requests to each defendant "to have the proper medical procedure done to have the painful stones removed" and that his requests were "ignored and denied."  (Compl. (Doc. No. 1) at 40.)

However, the evidence before the court belies plaintiff's claim.  On January 12, 2007, plaintiff underwent an abdominal ultrasound, which revealed the presence of gallstones. That same day plaintiff refused to have his gallbladder removed.  Though plaintiff disputes that he was offered gallbladder removal, he has offered no evidence to support his assertion in this

1    regard.  See Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (the nonmoving party has the

2    burden of identifying, with reasonable particularity, the evidence precluding summary judgment).

3    (Defs.' SUDF (Doc. No. 91) 27-28; Defs.' Ex. U-V (Doc. No. 91-3) at 6-8; Pl.'s Opp'n to Defs'

4    Mot. for Summ. J. (Doc. No. 96) at 14.)

5                 2) Claims Implicating Only Individual Defendants

6                       a.  Defendant Dial

7             Plaintiff has alleged that he was sent to the psychiatric ward, instead of a medical

8    ward, by defendant Dr. Dial who "went against his ethics" and appointed defendant Miller, a

9    nurse practitioner, to provide plaintiff with medical care.  (Compl. (Doc. No. 1) at 7-8.)

10         Plaintiff however has failed to provide this court with any evidence to support his

11    assertion that upon his arrival at HDSP defendant Dr. Dial assigned him to the psychiatric ward.

12    To the contrary, the only evidence before this court establishes that upon arrival at HDSP

13    defendant Dr. Dial admitted plaintiff into the Correctional Treatment Center for in-patient care

14    and monitoring.  (Defs.' SUDF (Doc. No. 91) 5; Def. Ex. C-D (Doc. No. 91-2) at 6-10; Pl.'s

15    Opp'n to Defs' Mot. for Summ. J. (Doc. No. 96) at 10 (concurring in part with Defs.' SUDF 5)).

16         Moreover, plaintiff has failed to submit to this court any authority in support of

17    his assertion that Dr. Dial acted unethically in allowing nurse practitioner Miller to participate in

18    plaintiff's medical care.  Indeed, it would seem entirely appropriate for a doctor to enlist the aid

19    of additional medical professionals when caring for a patient with multiple serious medical needs

20    such as plaintiff.

21                       b.  Defendant Miller

22         Plaintiff has alleged that defendant nurse practitioner Miller failed to notify her

23    supervisor that plaintiff would not be transferred to CMF-Vacaville and on December 14, 2006,

24    defendant Miller improperly gave plaintiff's prescribed eye medication to another inmate.

25    (Compl. (Doc. No. 1) at 7-12.)

26    /////

1    First, plaintiff has failed to provide this court with any legal authority supporting

2    his contention that defendant Miller should have notified her supervisor when she learned that

3    plaintiff would not be transferred to CMF-Vacaville.  Defendant Miller's responsibility was to

4    provide plaintiff with adequate medical care.  There is no evidence before the court that

5    defendant Miller or her supervisor had any authority over prisoner transfers.

6    Second, plaintiff's bare assertion that nurse practitioner Miller gave plaintiff's

7    prescribed eye medication to another inmate is unsupported by any evidence.  See Keenan, 91

8    F.3d at 1279 (the nonmoving party has the burden of identifying, with reasonable particularity,

9    the evidence precluding summary judgment).  To the contrary, the evidence submitted by

10   defendants in support of their motion for summary judgment indicates that December 14, 2006,

11   plaintiff was examined pursuant to a referral to opthamology.  The opthamologist notes for that

12   day indicate that plaintiff was not given a eye prescription because there was "no Rx needed."[14]

13   (Defs.' SUDF (Doc. No. 91) 20; Def. Ex. J (Doc. No. 91-2) at 22.)

14                                  c.  Defendant Dudley

15   Plaintiff has alleged that defendant Dudley, a certified physician's assistant, "is

16   not a licensed medical doctor" and is "purposefully, and falsely representing herself" as a doctor.

17   Plaintiff argues that as a result, anything defendant Dudley "has said is hearsay, false

18   information" and should be deemed as untrue."  (Compl. (Doc. No. 1) at 37.)  Plaintiff's

19   assertions regarding defendant physician's assistant Dudley are irrelevant, nonsensical, fail to

20   implicate plaintiff's medical care and fail to state a cognizable claim for relief.  Certainly,

21   plaintiff has presented no evidence in response to defendants' motion for summary judgment

22   suggesting that defendant Dudley was deliberately indifferent to plaintiff's serious medical

23   needs.

24   /////

25

26   [14] "Rx" is a common abbreviation for "prescription."

24

d.  <u>Defendant David</u>

Plaintiff has alleged that defendant physician's assistant David is "another person falsely pretending" to be a licensed doctor.  Plaintiff  alleges that defendant David prescribed plaintiff insulin in an amount insufficient to treat his diabetes.  Plaintiff further alleges that defendant David told plaintiff that his liver was "fine," despite lab reports to the contrary, and reviewed the results of plaintiff's "urgent" chest x-ray but ignored the findings of that x-ray. (Compl. (Doc. No. 1) at 38-39.)

First, with respect to plaintiff's claim that defendant David pretended to be a doctor, that assertion is irrelevant, nonsensical, fails to implicate plaintiff's medical care and fails to state a cognizable claim for relief.  Second, with respect to plaintiff's claim that defendant David prescribed him insufficient insulin to treat plaintiff's diabetes, assuming arguendo that plaintiff's assertion were true, that error would amount to nothing more than medical malpractice or negligence on the part of defendant David.  Plaintiff has offered no evidence in response to the pending summary judgment motion suggesting that defendant David deliberately prescribed an insufficient amount of insulin for plaintiff.  As stated above, "mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  <u>Broughton</u>, 622 F.2d at 460 (9th Cir. 1980) (citing <u>Estelle</u>, 429 U.S. at 105-06).

Finally, with respect to plaintiff's claims that defendant David told him that his liver was "fine," despite lab reports to the contrary, and ignored the results of his chest x-ray, plaintiff has failed to present any evidence supporting such a claim.  <u>See Keenan</u>, 91 F.3d at 1279 (the nonmoving party has the burden of identifying, with reasonable particularity, the evidence precluding summary judgment).  Rather, the evidence before the court on summary judgment does establish that on March 29, 2007, plaintiff's had an x-ray taken of his chest.  Defendant James was listed as the referring provider.  The physician who interpreted the x-ray stated that "small nodules cannot be excluded" and "recommended follow-up x-ray examination or CT of the chest for further evaluation."  While it appears that defendant Dr. James reviewed this report

25

1   on April 16, 2007, there is no evidence defendant David ever reviewed the report as alleged by

2   plaintiff.

3      The evidence before the court does establish that on April 2, 2007, defendant

4   David examined plaintiff and noted that he had a history of hepatitis C.  Defendant David

5   ordered blood tests to monitor plaintiff's liver functions.  However, plaintiff has failed to present

6   any evidence that defendant David reported that plaintiff's liver was "fine" or failed to take

7   action upon reviewing his chest x-ray.  Nor has plaintiff explained how these allegations, even if

8   they were supported by any evidence, would establish that defendant David was deliberately

9   indifferent to plaintiff's serious medical needs.  (Defs.' SUDF (Doc. No. 91) 34-35; Defs'. Ex. V,

10  Z, AA (Doc. No. 91-3) at 8, 19.)

11         e.  Defendant James

12     On June 3, 2007, plaintiff was inadvertently given an incorrect dose of insulin by

13  a non-defendant nurse practitioner.  Plaintiff claims that immediately after he was injected with

14  the incorrect dose of insulin he experienced a headache, blurry vision, dizziness, cramps in his

15  legs and feet, a ringing in his ears, became nauseous and vomited three times.  The nurse

16  practitioner who administered the medication called defendant James.  Plaintiff alleges that

17  despite being informed of the error and plaintiff's symptoms, defendant Dr. James negligently

18  failed to act.  (Compl. (Doc. No. 1) at 43.)

19     The evidence offered by defendants in support of their motion for summary

20  judgment, however, establishes that defendant James did respond to the report that plaintiff was

21  inadvertently given the incorrect dose of insulin by ordering that plaintiff be given an Ensure and

22  a sack lunch to eat and that plaintiff's blood sugar be monitored.  (Defs.' SUDF (Doc. No. 91)

23  47; Defs'. Ex. KK-LL (Doc. No. 91-3) at 48-51.)  Plaintiff has not offered any evidence that this

24  response was medically unacceptable or done in conscious disregard for plaintiff's health.

25  Rather, plaintiff simply disagrees with defendant Dr. James' course of treatment.  As noted

26  above, a mere difference of opinion between a prisoner and prison medical staff as to the proper

1    course of medical treatment for a condition does not give rise to a cognizable § 1983 claim.  <u>See</u>

2    <u>Estelle</u>, 429 U.S. at 107.

3            Plaintiff also claims that an inmate Jefferson heard a conversation between

4    defendant Dr. James and a nurse practitioner regarding the incorrect dose of insulin given to

5    plaintiff  and that defendant James simply ordered that plaintiff be taken back to his cell during

6    that conversation.  Inmate Jefferson has provided a declaration stating that he heard the

7    conversation "from a few feet away" and that defendant Dr. James "didn't do anything for

8    [plaintiff] but told the LVN's that he would be fine . . . ."  (Pl.'s Opp'n to Defs' Mot. for Summ.

9    J., Ex. Y, (Doc. No. 96-3) at 42.)

10           Fully crediting inmate Jefferson's declaration, even if defendant Dr. James did

11   nothing in response to plaintiff's condition because he believed plaintiff would be fine, at worst it

12   would be established that defendant Dr. James was negligent in responding to plaintiff's medical

13   condition, as plaintiff has alleged.  Again, "mere 'indifference,' 'negligence,' or 'medical

14   malpractice' will not support this cause of action."  <u>Broughton</u>, 622 F.2d at 460 (9th Cir. 1980)

15   (citing <u>Estelle</u>, 429 U.S. at 105-06).

16           In a similar regard, plaintiff alleges that on June 24, 2007, he had a hyperglycemic

17   reaction, blacked out and was rushed to the prison's emergency room.  Defendant Dr. James was

18   contacted by telephone regarding plaintiff's condition.  Plaintiff alleges that defendant James

19   "negligently" ordered that plaintiff be given a medication used to treat people suffering from a

20   drug overdose and ordered that plaintiff be "inflicted . . . with an unnecessary and intrusive,

21   painful" catheter.  (Compl. (Doc. No. 1) at 44.)

22           Again, assuming arguendo that defendant Dr. James' treatment of plaintiff on

23   June 24, 2007, was negligent, such negligence would not support plaintiff's Eighth Amendment

24   cause of action.  Moreover, plaintiff has offered no evidence to support an assertion that

25   defendant Dr. James' treatment of plaintiff on June 24, 2007, was even negligent.  Vague and

26   /////

1   conclusory allegations, such as this one, concerning the involvement of official personnel in civil

2   rights violations are not sufficient.  See Ivey, 673 F.2d at 268.

3                          f.  Defendant Roche

4           Plaintiff alleges that defendant Roche, HDSP's Chief Medical Officer ("CMO"),

5   reviewed plaintiff's medical files and was aware that plaintiff was not receiving appropriate care

6   for his liver disease, diabetes and gallstones, and was also aware that plaintiff had been denied a

7   medical diet.  (Compl. (Doc. No. 1) at 13, 40.)

8           Plaintiff has not alleged, however,  that defendant Dr. Roche ever actually

9   participated in plaintiff's medical care, with respect to the treatment of his liver disease, diabetes

10  or gallstones.  Indeed, plaintiff acknowledges that he "never met the man" in referring to Dr.

11  Roche.  (Pl.'s Mar. 5, 2010 Dep.  (See Notice of Lodging (Doc. No. 92) at 91:19-21.)  Instead,

12  plaintiff complains that as the CMO defendant Roche should have intervened on plaintiff's

13  behalf in response to the medical care provided by the other defendants.  (Id. at 92:11-14.)

14          "A supervisor is only liable for constitutional violations of his subordinates if the

15  supervisor participated in or directed the violations, or knew of the violations and failed to act to

16  prevent them."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  "There is no respondeat

17  superior liability under § 1983."  Mortimer v. Baca, 594 F.3d 714, 721 (9th Cir. 2010) (citing

18  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Here, with respect to the allegations

19  discussed above, the court finds no constitutional violation of plaintiff's Eighth Amendment

20  rights on the part of any defendant.  Given that conclusion, no rationale trier of fact could find

21  liability on the part of defendant Dr. Roche in his role as CMO with respect to these claims.

22          3)  Conclusion

23          With respect to the claims discussed above, the court finds that the defendants

24  have borne their initial responsibility of demonstrating that there is no genuine issue of material

25  fact with respect to the adequacy of the medical care the defendants provided to plaintiff.  While

26  it is undisputed that plaintiff has some very serious medical needs, no evidence has been

presented to the court indicating that any defendant acted with deliberate indifferent to any of plaintiff's serious medical needs.  Indeed, the evidence before this court demonstrates that from November 2006, when plaintiff was transferred to HDSP, until August 2007, when he filed his complaint in this action, not a single month passed in which plaintiff did not receive some type of medical care, often having multiple medical examinations and diagnostic tests within a given month.  The named defendants are just some of the numerous doctors and medical professionals, including specialists in opthamology and gastroenterology, who examined plaintiff and provided him medical care for his serious medical needs.  Those doctors ordered various types of tests to diagnose and monitor plaintiff's conditions including, x-rays, CT scans, an ultrasound, an endoscopy, a colonoscopy and various blood tests and urine analysis.

While it is readily apparent that plaintiff disagrees with the medical professional's course of treatment, as reiterated many times above a mere difference of opinion between a prisoner and prison medical staff as to the proper course of medical treatment for a condition does not give rise to a cognizable § 1983 claim.  Estelle, 429 U.S. at 107.)  As noted above, in order for plaintiff to establish a violation of his rights under the Eighth Amendment arising out of his medical care he must show that the defendants responded to his serious medical needs with deliberate indifference.  Farmer, 511 U.S. at 834.  Here, even accepting plaintiff's criticisms of defendants' chosen medical treatment as true, plaintiff has not offered any evidence establishing that any defendant purposefully disregarded plaintiff's serious medical needs as he claims. Plaintiff has not shown that any defendant was anything more than negligent in failing to provide the medical treatment plaintiff argues was appropriate.  Of course, "mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton, 622 F.2d at 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06).  See also Toguchi, 391 F.3d at 1057 ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.");  McGuckin, 974 F.2d at 1059 (same).  Thus, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does

1   not state a valid claim of medical mistreatment under the Eighth Amendment." Estelle, 429 U.S.

2   at 106.

3           Given the evidence submitted by defendants in support of their motion for

4   summary judgment, the burden shifts to plaintiff to establish the existence of a genuine issue of

5   material fact with respect to his claim that the defendants demonstrated deliberate indifference to

6   his serious medical needs.  As noted above, to demonstrate a genuine issue, the opposing party

7   "must do more than simply show that there is some metaphysical doubt as to the material facts

8   . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

9   nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation

10  omitted).

11          The court has considered plaintiff's opposition to the pending motion for

12  summary judgement and his verified complaint.  In considering defendants' motion for summary

13  judgment, the court is required to believe plaintiff's evidence and draw all reasonable inferences

14  from the facts before the court in plaintiff's favor.  Drawing all reasonable inferences in

15  plaintiff's favor, the court concludes that, with respect to the claims discussed above, plaintiff

16  has not submitted sufficient evidence to create a genuine issue of material fact with respect to his

17  claim that the defendants responded to his serious medical needs with deliberate indifference.

18  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

19          Specifically, with respect to the claims address above, plaintiff has tendered no

20  competent evidence demonstrating that the course of treatment pursued by defendants was

21  medically unacceptable under the circumstances.  Nor has plaintiff has provided this court with

22  any competent evidence demonstrating that the defendants chose their diagnosis and course of

23  treatment of his condition in conscious disregard of an excessive risk to plaintiff's health.

24          Accordingly, for all of the foregoing reasons, with respect to the claims discussed

25  above, the court concludes that the undisputed evidence before the court establishes that the

26  defendants were not deliberately indifferent to plaintiff's serious medical needs and are entitled

1 to summary judgment in their favor with respect to plaintiff's claim that he received inadequate

2 medical care from the defendants in violation of his rights under the Eighth Amendment.[15]

3         B. <u>Claims As to Which Summary Judgement Should Be Denied</u>

4         Plaintiff also alleges with respect to the treatment of his pain that:  (1) the

5 defendants denied him medication that was effective in treating his pain; and (2) the defendants

6 prescribed him pain medication that they knew was harmful to his liver.  Plaintiff asserts these

7 claims against all named defendants.

8         1) <u>Effective Pain Medication</u>

9         Plaintiff repeatedly claims that he made requests to each defendant to receive

10 effective treatment for his pain and that each of the defendants refused to provide him effective

11 pain relief.  (Compl. (Doc. No. 1) at 13-14.)  For example, plaintiff alleges that soon after he

12 arrived at HDSP, defendant nurse practitioner Miller, under the supervision of defendant Dr. Dial

13 and defendant Dr. Roche, "tapered off" plaintiff's methadone, causing him to "suffer the pain of

14 withdrawal . . ."  (<u>Id.</u> at 9.)

15         Moreover, included as part of plaintiff's complaint is his March 17, 2007, inmate

16 appeal complaining of "severe pain" and claiming that the Tylenol, Ibuprofen, and Naprosyn he

17 had been prescribed were "antagonists to the liver" and do "nothing but worsen the condition."

18 (<u>Id.</u> at 19-20.)  On April 11, 2007, defendant Roche issued a Second Level Response, in which he

19 noted that plaintiff was complaining of severe pain and that the Tylenol, Ibuprofen and Naprosyn

20 that he had been prescribed were ineffective.  Defendant Roche "granted" plaintiff's appeal, in

21 that defendant Roche determined plaintiff had already "received proper medical care."  (<u>Id.</u> at 21-

22 25.)

23         Plaintiff also claims that on July 4, 2007, he was suffering from severe abdominal

24 pain that caused him to black out, that he was examined by defendant Dr. Abdur-Rahman, and

25

26      [15]  In light of this recommendation the court need not address defendants' argument that they are entitled to summary judgment in their favor on qualified immunity grounds.

that defendant Abdur-Rahman refused to provide plaintiff any medication for his pain.  (Id. at 47.)  Plaintiff also alleges that he has asked defendants Roche, Dial, James, Miller, Dudley and David, for medication to treat his "constant severe pain" and that all of his requests were denied. (Id. at 40.)

Counsel for defendants acknowledges that plaintiff was denied methadone because HDSP policy does not allow general population prisoner to receive methadone, but argues that the defendants nevertheless did attempt to treat plaintiff's pain by prescribing him alternative pain relievers such as Tylenol, Naprosyn/Naproxen, aspirin and Neurontin/Gabapentin.  Defendants argue that plaintiff's claim is simply that "he preferred Methadone over aspirin and Naproxen to treat his chronic pain" and assert that plaintiff "does not have a constitutional right to choose his pain medication."  (Defs.' Mem. of P. & A (Doc. No. 90-1) at 7, 17-18, 20-21, 25-26, 31.)

Defendants also argue that the vast record reflecting plaintiff's treatment and the fact that plaintiff was prescribed alternative medications to treat his pain undermines his deliberate indifference claim in this regard.  (Defs.' Mem. of P. & A (Doc. No. 90-1) at 20.)  A prisoner however need not prove that he was completely denied medical care in order to state a cognizable Eighth Amendment claim.  See Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.  Moreover, while the court agrees that plaintiff does not have a constitutional right to choose his own medication, the Eighth Amendment does protect plaintiff from the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104.

Here, it is undisputed that plaintiff had serious medical needs and that a prior treating physician of his prescribed methadone to treat plaintiff's pain.  It is also undisputed that upon plaintiff's transfer to HDSP defendants refused to continue plaintiff on methadone, not because any one of them determined that it was medically unnecessary, but solely because HDSP

1   policy prohibits general population inmates from receiving methadone.  Plaintiff has alleged that

2   the alternative pain medications the defendants prescribed were ineffective in treating his pain.

3   Moreover, plaintiff has alleged that he informed each defendant that the alternative pain

4   medications were ineffective and that each defendant knew that to be the case but nonetheless

5   refused to prescribe methadone, which had been effective in treating plaintiff's pain, or any other

6   pain medication that was effective in doing so.

7           A prisoner can state a triable issue of fact with respect to an Eighth Amendment

8   deliberate indifference claim where prison officials and doctors deliberately ignore the express

9   orders of a prisoner's prior physician.  See Jett, 439 F.3d at 1097-98 (finding a triable issue of

10  fact as to whether a prison doctor was deliberately indifferent to a prisoner's medical needs when

11  he decided not to request an orthopedic consultation as the prisoner's emergency room doctor

12  had previously ordered); Hamilton v. Endell, 981 F.2d 1062, 1067 (9th Cir. 1992) (finding a

13  triable issue of fact as to whether prison officials were deliberately indifferent to prisoner's

14  serious medical needs when they relied on the opinion of a prison doctor instead of the opinion of

15  the prisoner's treating physician and surgeon), abrogated in part on other grounds by Estate of

16  Ford v. Ramirez-Palmer, 301 F.3d 1043, 1045 (9th Cir. 2002); see also Estelle, 429 U.S. at 104-

17  05 (holding that deliberate indifference may manifest "by prison doctors in their response to the

18  prisoner's needs or by prison guards in intentionally denying or delaying access to medical care

19  or intentionally interfering with the treatment once prescribed"); Lopez v. Smith, 203 F.3d 1122,

20  1132 (9th Cir. 2000) (holding that a prisoner may establish deliberate indifference by showing

21  that a prison official intentionally interfered with his medical treatment); Wakefield v.

22  Thompson, 177 F.3d 1160, 1165 & n. 6 (9th Cir. 1999) (holding that "a prison official acts with

23  deliberate indifference when he ignores the instructions of the prisoner's treating physician or

24  surgeon."); Tolbert v. Eyman, 434 F.2d 625, 626 (9th Cir. 1970) (prisoner's allegation that

25  "warden refused to allow him authorized medicine that he needed to prevent serious harm to his

26  health" states a cognizable civil rights claim.)

1        Given the evidence before the court on summary judgment, plaintiff has raised a

2   triable issue as to wether the defendants' violated his rights under the Eighth Amendment by

3   substituting mere over-the-counter medications such as Tylenol and aspirin for methadone,

4   thereby causing plaintiff to experience withdrawal symptoms and pain.  See Franklin v. Dudley,

5   2:07-cv-2259 FCD KJN P, 2010 WL 5477693, *6-8 (E.D. Cal. Dec. 29, 2010) (existence of

6   triable issue of fact as to whether defendant violated Eighth Amendment precluded the granting

7   of summary judgment where plaintiff was previously prescribed narcotic pain medication but

8   now was given only Motrin, Naprosyn or Tylenol under prison's no-narcotics policy); Strain v.

9   Sandham, No. Civ. S-05-0474 GEB GGH P, 2009 WL 172898, at *7 (E.D. Cal. Jan. 23, 2009)

10   (summary judgment denied where "Plaintiff has raised triable issues that Tylenol and other over-

11   the-counter medications were inappropriate substitutes for Methadone").  But cf. Wesley v.

12   Sayre, 2010 WL 3398526, *7 (N.D. Cal. 2010) (summary judgment granted in favor of

13   defendants on deliberate indifference claim where they prescribed plaintiff Tylenol with codeine

14   to replace methadone, along with physical therapy, injections for pain, and consultation with a

15   pain specialist).

16        Moreover, although it is undisputed that defendant Roche never treated plaintiff, it

17   is also undisputed that defendant Roche was aware of plaintiff's complaint that the pain

18   medication being substituted for methadone was ineffective since defendant Roche responded to

19   plaintiff's inmate appeal raising that claim.  Even if defendant Roche relied on the opinions of

20   the other defendant doctors, those opinion were arguably inferior medical opinions since the

21   decision to deny plaintiff methadone was not based on a determination that methadone was

22   medically unnecessary but because HDSP policy did not  allow general population inmates to

23   receive it.  See Hamilton, 981 F.2d at 1067 ("By choosing to rely upon a medical opinion which

24   a reasonable person would likely determine to be inferior, the prison officials took actions which

25   may have amounted to the denial of medical treatment, and the 'unnecessary and wanton

26   infliction of pain.' ")  The evidence before the court establishes that defendant Dr. Roche had the

1   authority and opportunity to procure the medical treatment plaintiff sought and appears to have

2   needed, at least under one medical view.  A rationale juror could find based upon the evidence

3   submitted to the court that defendant Dr. Roche ignored plaintiff's complaint about the

4   ineffective nature of the Tylenol, aspirin and other medications he was being given and the pain

5   being suffered as a result.  See Jett, 439 F.3d at 1098 ("prison administrators . . . are liable for

6   deliberate indifference when they knowingly fail to respond to an inmate's requests for help.");

7   see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for

8   constitutional violations of his subordinates if the supervisor participated in or directed the

9   violations, or knew of the violations and failed to act to prevent them.").

10          Given the evidence before the court on summary judgment, viewed in the light

11  most favorable to plaintiff, a reasonable jury could find the defendants were deliberately

12  indifferent to plaintiff's serious medical need.  Specifically, given this evidence a rationale jury

13  could find that the defendants failed to provide adequate medical care in treating his pain.

14                          2)  Harm To Plaintiff's Liver

15          Plaintiff has also alleged that he asked, "on several medical slips" and in person

16  for pain medication that would not adversely affect his liver.  (Compl. (Doc. No. 1) at 47.)

17  Plaintiff asserts that the defendants prescribed him Tylenol, aspirin, niacin, and Naprosyn

18  knowing that those medications were harmful to his liver and in spite of plaintiff's requests that

19  he be provided medications that would not harm the condition of his liver.  (Id. at 49.)  Plaintiff

20  claims that he repeatedly requested that he be prescribed methadone because it was not harmful

21  to his liver.  (Id.)  Moreover, as noted above, in a March 17, 2007 Inmate Appeal attached to

22  plaintiff's complaint, he stated that the Tylenol, Ibuprofen, Naprosyn and other over-the-counter

23  /////

24  /////

25  /////

26  /////

1   pain medications he was prescribed by prison medical staff were "antagonists to the liver and do

2   nothing but worsen the condition."[16]  (Id. at 19.)

3          As noted, a physician need not fail to treat an inmate altogether in order to violate

4   that inmate's Eighth Amendment rights.  Ortiz, 884 F.2d at 1314.  rather, a failure to competently

5   treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate

6   indifference in a particular case.  Id.  In order to prevail on such a claim, plaintiff must establish

7   that the defendant's course of treatment was "medically unacceptable under the circumstances,"

8   and that the defendant "chose this course in conscious disregard of an excessive risk to plaintiff's

9   health."  Jackson, 90 F.3d at 332 (citing Farmer 511 U.S. at 835-36).

10         Here plaintiff has alleged that the defendants prescribed him medications that

11  were harmful to his liver.  Moreover, plaintiff has alleged that the defendants knew the

12  medications were harmful to his condition but continued to prescribed these medications anyway.

13  Counsel for defendants acknowledges plaintiff's precise argument that the medications the

14  defendants prescribed for him were "harmful to [plaintiff's] liver," and that plaintiff requested

15  alternate pain medications that were not harmful to his liver, several times in the memorandum of

16  points and authorities in support of defendants' motion for summary judgement.  (See Defs.'

17  Mem. of P. & A. (Doc. No. 90-1) at 17, 20, 22, 24, 28, 31.)  Nevertheless, despite these repeated

18  acknowledgments, counsel for defendants never disputes, presents evidence regarding or even

19  addresses plaintiff's assertions that:  (1) the medications the defendants prescribed were harmful

20  to his liver; and (2) that the defendants were aware these medications were harmful to plaintiff's

21  liver but prescribed them anyways.

22         In his response to defendants' statement of undisputed facts, plaintiff alleges that

23  laboratory tests establish that his liver disease has progressed since he arrived at HDSP and

24  repeatedly asserts that the defendants knowingly prescribed him medication that was harmful to

25

26         [16]  Defendant Dr. Roche "granted" plaintiff's Inmate Appeal, in that defendant Roche
    determined that plaintiff had "received proper medical care . . . ."  (Compl. (Doc. No. 1) at 25.)

1  his liver.  (Pl.'s Resp. to Defs' SUDF (Doc. No. 96) at 9, 12, 15, 19.)  Plaintiff also submitted, by

2  way of exhibits to his opposition to defendants' motion for summary judgment, a copy of two

3  documents from the "Hepatitis C Awareness Project."  (Pl.'s Opp'n to Defs' Mot. for Summ. J.,

4  Ex. L-M, (Doc. No. 96-1), at 105-08.)  The first document states that methadone does not

5  adversely affect the liver.  (Pl.'s Opp'n to Defs' Mot. for Summ. J., Ex. L, (Doc. No. 96-1), at

6  106.)  The second document states that, "individuals with liver disease should avoid using these

7  NSAIDs."  (Pl.'s Opp'n to Defs' Mot. for Summ. J., Ex. M, (Doc. No. 96-1), at 108.)  A list of

8  commonly used NSAIDs is then provided.  (Id.)  Included in the list of NSAIDs that individuals

9  with liver disease are advised to avoid are aspirin and Naprosyn/Naproxen.  (Id.)  The documents

10  also suggests that caution be taken with respect to the use of Tylenol and niacin, in high doses for

11  patients with liver disease .  (Id.)

12       Counsel for defendants acknowledges that plaintiff submitted this exhibit as part

13  of his opposition to the pending motion for summary judgment, noting that it was also attached

14  as an exhibit to plaintiff's complaint and acknowledges that plaintiff requested methadone from

15  prison medical staff because "[it] would not be harmful to his liver."  (Defs.' Reply (Doc. No.

16  99) at 3, 8.)  Nevertheless, defense counsel does not address or dispute plaintiff's claim in this

17  regard.

18       Plaintiff's has alleged that the defendants knowingly and repeatedly prescribed

19  him medication that was harmful to his liver, and that the defendants did so in conscious

20  disregard to the harm posed to his liver.  See McGuckin, 974 F.2d at 1060-61 ("[A] finding that

21  the defendant repeatedly failed to treat an inmate properly . . . strongly suggests that the

22  defendant's actions were motivated by 'deliberate indifference' ").  Plaintiff's claim has gone

23  unaddressed and undisputed by counsel for the defendants.  Therefore, the court finds that the

24  defendants have not borne their initial responsibility of demonstrating that there is no genuine

25  issue of material fact with respect to this claim.  See Celotex, 477 U.S. at 323 (moving party

26  /////

1    always bears the initial responsibility of informing the district court of those portions of the

2    pleadings that demonstrate an absence of a genuine issue of material fact).

3              3) Qualified Immunity

4              For the reasons discussed above, based upon the evidence presented in connection

5    with the pending summary judgment motion a rationale trier of fact could find that defendants

6    violated plaintiff's rights under the Eighth Amendment.  Moreover, the state of the law in 2006-

7    2007 clearly would have given defendants fair warning that their failure to provide plaintiff with

8    adequate medical care was unconstitutional.  As the United States Supreme Court has

9    recognized:

> [G]eneral statements of the law are not inherently incapable of
> giving fair and clear warning, and in other instances a general
> constitutional rule already identified in the decisional law may
> apply with obvious clarity to the specific conduct in question, even
> though "the very action in question has [not] previously been held
> unlawful."

14   United States v. Lanier, 520 U.S. 259, 271 (1997) (quoting Anderson v. Creighton, 483 U.S. 635,

15   640 (1987)).  By 2006, it was well established that prison officials could not be deliberately

16   indifferent to a prisoner's serious medical needs or deny, delay, or intentionally interfere with

17   medical treatment for a prisoner's serious medical needs.  See Estelle, 429 U.S. at 104-06;

18   Hamilton, 981 F.2d 1066-68 (defendants not entitled to qualified immunity when they ignored

19   orders of prisoner's prior physician).  Here, the defendants were on notice that they could not be

20   deliberately indifferent to plaintiff's serious medical needs, specifically his need for effective

21   pain relief and the need for medication that did not unnecessarily pose a risk of harm to his liver.

22             Accordingly, the court concludes that, with respect to plaintiff's claims that the

23   defendants failed to effectively treat his pain and knowingly prescribed medication that were

24   harmful to his liver, the defendants are not entitled to summary judgment in their favor with

25   respect to the affirmative defense based on qualified immunity.

26   /////

**CONCLUSION**

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' August 4, 2010 motion for summary judgment (Doc. No. 90) be denied as to plaintiff's claim that the defendants denied him constitutionally adequate treatment for his pain;

2. Defendants' August 4, 2010 motion for summary judgment (Doc. No. 90) be denied as to plaintiff's claim that the defendants knowingly prescribed him medication that was harmful to his liver; and

3. Defendants' August 4, 2010 motion for summary judgment (Doc. No. 90) be granted in all other respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 14, 2011.

_Dale A. Drozd_
_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:6
chess1767.SJ

39